Mr. McReynolds for Appellant, Palfinger Marine, and I was wondering if it would be permitted to allow my bright and capable young partner to take rebuttal, that I reserve five minutes. You can find it any way you want to. Okay, that's great. Okay, thank you. So, I know you've read the briefs. I would like to start off by making four statements that I hope that this Court will agree are incontrovertible. One, lifeboats are vessels. Two, transporting persons in a vessel over navigable waters is a quintessential maritime function or activity. Three, the only purpose and function of a vessel is to transport persons safely over navigable water during an emergency or incident requiring evacuation from whatever structure or vessel the lifeboats are attached. Four, under North Pacific contracts to inspect, maintain, or repair vessels are maritime contracts. Now, if you agree with those four statements, then the conclusion is inescapable that the Palfinger's contract with Shell Oil, the owner of the Auger platform in the Gulf of Mexico, which was only to inspect, repair, maintain the lifeboats, the vessels, is a maritime contract. The District Court reached a different conclusion. How did that happen? Let me see if I can explain where I think the District Court got it wrong. First, use of lifeboats, regardless of whether attached to a floating offshore facility like the Auger, which is not considered under Coast Guard regulations to be a vessel, or a mobile offshore drilling unit, which under Coast Guard regulations are considered to be vessels, their use of them are quintessentially maritime activities to save people in the event of an evacuation. That function, that activity does not change regardless of where those lifeboats are attached. MODU or an FOWEP, it's the same function, too. I think we can start with the Court's reliance on Grand Isle versus Secor is where the analysis went wrong. Now, if you recall, that was an en banc decision. It involved two contracts, between BP, the owner of the platform, and Grand Isle, which was a contractor who was retained or hired to repair or maintain the platform, the platform itself, offshore facility, which is not a vessel, and a separate contract with Secor, which was a transportation contract to carry the employees of the contractors back and forth to the platform. There was no dispute, I don't think, and it wasn't really relevant to the analysis of the decision that Secor's contract as a transportation contract was a maritime contract. The question had to do with what was the nature of Grand Isle's contract. Both contracts were identical in form and language. They both contained what are called reciprocal indemnity agreements, just like the contract here with the two contractors who had no contractual relationship with each other. Judge Selfick, I know you were on the dissenting decision of that case, but the en banc conclusion of the majority of the Court was that determining the situs of the location of the performance of the contract was determined by where the majority of the work under the contract was performed as opposed to where the injury occurred, which was on the vessel owned and operated by Secor. Given that situs test, and given the fact that the contract with Grand Isle was a contract to repair or maintain the platform, it wasn't a maritime contract, therefore it was not subject to federal law, it was governed by Louisiana law, and the reciprocal indemnity agreement was not enforceable. Counsel, let me ask you, does it matter in this case if the vessel, you've identified the lifeboat as the vessel, central to your argument, it's not being used as the foundation for the defendant's work? In other words, does it matter that the lifeboats are merely an accessory or an emergency, a piece of emergency equipment to the platform on which the actual work is done? It's not a trick question. I'm specifically thinking about the Doiron case. The Doiron case, yeah. Requiring the vessel. Yeah, I was going to get to that. Yeah, I'm going to get to that, and I'll get to it right now for you. Okay, yeah, if you would. So, Doiron, look, Doiron was a, it wasn't even an Outer Continental Shelf case, it was a territorial waters case, and it had to do with the platform. The object of the contract was the servicing of that platform, right? And there was no contemplation of the parties at the time the contract was let, or in the first few years in which they were operating under that agreement, that they needed a vessel to do it. It's only later, when they got out there to try to move some pieces of equipment, they needed a barge, they had to call in a vessel, and the whole point of the en banc decision in Doiron was to jettison the old Davis and Son factors that included within the analysis tort criteria that had nothing to do with the contract analysis, right? And so, and Doiron specifically relied upon Kirby, North Southern Railroad versus Kirby, which is a bill of lading case of a transportation of a carriage by sea, to use that analysis to interpret, to come up with the test that it came up with, the new Doiron test, to determine whether the contract is maritime. So, Doiron test is what our standard is, right? It is for, well, yes, but let's see, what is it, you know, I want you to go back, there's a very telling footnote in Doiron, footnote 52, today, I think it's important to understand this, footnote 52 in Doiron, we deal today only with determining the maritime or non-maritime nature of contracts involving the exploration, drilling, and production of oil and gas. If an activity in a non-oil and gas sector involves maritime commerce and work from vessel, we would expect that this test would be helpful in determining whether a contract is maritime. Palfinger's contract is not an oil and gas contract, it is a repair, it's a vessel repair contract. It has nothing to do with any of the operational activities on the auger, which are used to extract the oil out of the seabed, right? So the fact that, and to bring it back to what I was saying about Grand Isle, the reciprocal indemnity agreement is in the contract between the platform owner, here, Shell, offshore, equivalent to BP in Grand Isle, and Palfinger, which is the vessel repair contractor, similar to the Seacorp transportation contractor. So, your question, does it matter where they do the work? If you're going to accept Kirby's command, which was taken strictly right out of North Pacific, that when you're conceptually analyzing a maritime contract, you don't look at where the work is performed or whether a vessel is involved, right? They're not relevant to the conceptual analysis of the nature of the contract. The question is, is it related to a maritime service, and is it involved in a maritime transaction? And repair contracts are that. They are maritime services and maritime transactions. Would it make a difference if the contract was, let's say, to go aboard the platform and check for fire extinguishers, fire retardant outfits, helmets, any other type of safety or emergency equipment? It wouldn't make any difference at all. The object of the contract, the object of the contract, in this case, the object of all vessel repair contracts are the vessels themselves. Where the vessels are located when they're performing that work to inspect them, they're usually done in dry dock. It doesn't matter where the vessel is when you're doing the work, and it also doesn't matter if you have to use a vessel to do it, because you don't use a vessel to perform the repair of a vessel. You usually repair on land, in dry dock, from the deck, using equipment on the deck. This contract required PALFINGER to inspect and maintain and, if necessary, repair the live boats, which are vessels, and their launching mechanisms, required by Coast Guard regulations. Same regulations that apply to mobile offshore drilling units. I mean, if all the facts of this case remained the same, and all you changed was the type of platform the lifeboats were fixed upon, from a non-vessel floating offshore facility to a vessel mobile offshore drilling unit, we wouldn't be here. So, and the question is whether that, that distinction matters in the line of cases that began with North Pacific concerning contracts to repair vessels, and I'm, my argument, our argument is that no, it doesn't. It doesn't matter if the vessel is attached to a non-vessel platform in the Outer Continental Shelf or a vessel platform in the Outer Continental Shelf. Nelson, let me ask you about North Pacific, which actually was decided in Kirby, but not for any particularly useful purpose, as far as I can tell. It seems to me you're saying, almost, that we should ignore Doron, that that test, I really don't see how it helps you, but you're saying there's sort of a, both the footnote that you cited out of our in-bank opinion, as well as North Pacific, which, which I assume is still good law, that says construction of a vessel is not maritime, but once it's a vessel, repairs of a vessel is a maritime contract. That seems to be the thrust of your argument, and I just don't see how that fits with Doron, so help me with that. Doron does not command, what, Doron is limited to the type of contract. Okay, so you're isolating it to the specifics. Well, isn't it, what does, does this contract relate to this, to provide service for the facilitation of oil and gas from a platform? And that wasn't an OCS number. This contract is not that. But does that, does that mean that unless you can fit it into the first test, you don't have a maritime contract? That's not true. Doron itself, in footnote 49, listed six different cases from different circuits, which didn't involve the same fact pattern that Doron did, who said that our test that we're proposing today is not inconsistent with the results of each of those cases. Two of those cases were contracts, the objects of which, not requiring the performance of, had nothing to do with oil and gas production. One was to research a shipwrecked vessel, and one was to remove a sunken ship from, from navigable waters. Both considered to be maritime contracts. So if, if Doron's test is not inconsistent with those cases, it's not inconsistent with the specific contract here, which is under North Pacific and Caribbean, would be considered a maritime contract. Work on a oil and gas platform, it's awful hard to me to, to pull Doron out of this. Safety equipment that was a vessel, it does seem to me North Pacific has to be dealt with. But it is still working on an oil and gas platform. And the issues we've had in other cases of, was, was a crane that came out there on a separate vessel, anticipated that it needed to be on a vessel or not. We are all talking about, not all, but some of the cases are dealing with the kinds of work needed to maintain an oil and gas platform. And that's what this was. Your contract. Let me, let me, I'm sorry, let me push back on that, Your Honor. This contract is not, had nothing to do with maintaining the platform. Maintaining the safety of nothing on that platform. Well, maintaining the vessels so that in the event of an emergency, they have them to escape from the platform. Didn't that facilitate oil and gas production? And that goes back to Doron's question one. Okay. Let me ask you this. Let me, so let me come back with that. How many lifeboats are, are assigned to oil derricks in West Texas or the Oklahoma, Texas panhandle or the Southern, Southern Bakersfield region of California? I don't know. Not a one. You know why? Because they're not needed for the production of oil and gas and the lifeboats for the outer continental shelf. Correct. They are not needed for the production of oil and gas in the outer continental shelf. Well, but the, but your counsel opposite is going to argue that we have to have the safety issue. You have to comply with the regulations which require the lifeboats. And why do you drill for oil? That's exactly right. And why? Because the workers out there are exposed to the perils of the sea. It risks they do not expose to in West Texas or the Oklahoma panhandle or Southern California. And why? And those same regulations that apply to this auger, which is not a vessel, apply to mobile offshore drilling, which are vessels, right? And, and when those lifeboats are not being used, in other words, there's no, and the normal operation of the auger, there's no risk, there's no evacuation, there's no emergency. They're never used. They don't go, they don't use those lifeboats to perform any function on the auger in connection with the extraction of the oil from the seabed. They're there solely in case they need to get off the thing when it's not working. So no, they're not used and they're not needed for the production of oil and gas. They aren't used and they are needed only for a safe evacuation. And that was the whole purpose of the contract. The work that Pal Finker did about time. I think you're still answering, but I was hoping you were going to wrap up soon. I'm going to need some time from my, from my, from my partner, you know, so I, but he can come back to this. He can come back to that and I'll come back. Okay. Thank you, Your Tom Diaz on behalf of the appellees. And let me address a couple of issues that were just raised here. And the first, well, actually let me raise an issue that wasn't addressed period. And I think it's no coincidence in the last 20 minutes of oral argument by Pal Finker, by Mr. McReynolds, that the words maritime commerce were never uttered and maritime commerce is the premise and the foundation of the application of maritime law that was based on the Supreme Court's 2004 decision in Kirby. And the absence of maritime commerce means that maritime law does not apply. And that was the sea change in Dwaron and Judge Southwick, you could perhaps provide what I'm trying to divine from Dwaron. And that is the panel decision, which you authored concluded that the contract was maritime, even though it was very peculiar to downhole operations on a well, but a vessel needed to be brought in in order to complete those operations because of limitations on the platform size. And under the Davis and Sons test, the six part test, ultimately the balance of the facts weighed in favor of maritime. But I think the panel and the concurring opinion for which you joined with Judge Davis had misgivings about that conclusion because the ultimate was the was teeing up the issue for and ultimately when the en banc decision, Kirby was embraced. It said and Judge Davis wrote that it lit the path to a new test in the abandonment of Davis and Sons. What do you do with North Pacific? North Pacific is a case 1919 that addressed on its face, it says the repair of vessels is a maritime contract. Absolutely. And there are two issues that make North Pacific in opposite to the appeal here. And the first is factual. Palfinger did not have a vessel repair contract with Shell. If you look to the purchase order, which is the foundation for the purchase contract, the master service contract, it calls for inspections of the davit systems, the davit systems that hold the lifeboats that are attached permanently, davit systems that is, to the platform. The inspection didn't have to do with looking at the lifeboats themselves, but it did. And I'm just doing the three different elements of the purchase order. The second is the davit cable change out, which lowers and rises to lifeboats, number one and number three on the platform. And the third was the inspection of the lifeboats, simply going on the lifeboats and checking to see if they have water bottles, seasick pills and the like. But North Pacific said vessel repair contracts for maritime where in those three elements, is there any vessel repair? And there's no action could determine the repairs are needed. And in fact, here it did reveal that inspections were needed itself, but on corroded cable or chain, right? Correct. It was never performed. And therefore, there was no repair. It should have been, but it wasn't here. So we're outside the ambit of North Pacific. But even more fundamental than that, from a legal perspective, North Pacific, North Pacific dealt with the repair of a vessel that was under charter to go to Alaska, a vessel that was in maritime navigation. And the court stated that she was under charter for an Alaskan voyage to be commenced as soon as repairs could be completed. And therefore, we have a vessel engaged in maritime transportation for which maritime law does apply to the repair of those vessels. And here, I will agree with only number one of Mr. McReynolds, four issues that he presented first in his oral argument, and that is lifeboats are vessels. But the next three questions reveal that maritime commerce is entirely absent in this case, that the trans it is not those lifeboats are not there in order to protect workers from the perils of the sea. They protect them from the perils of oil and gas operations. So is it a distinguishing factor that the work here was not done from a vessel? Like a crane barge? Judge Inglehart, I believe it is. And so if you look at Judge Davis for the latter part of the Dwaron decision, talking about vessels being brought in to perform work, in part with the work being performed by the crew members aboard the vessels, just like you had in Crescent Services, where you had a crane barge brought in or quarter barges with a crane, or in Berrios, where you have a tug and a barge. Here, there is no vessel that is brought in in order to perform the work. And in a peculiar oil and gas context, which the Fifth Circuit has addressed for the last 40, 50 years, trying to divine whether maritime law applies or not, Dwaron appropriately finally asks, are vessels in commerce needed to perform the work? And that is entirely absent here. And Judge Summerhays applied. I think Dwaron is just on all fours with the circumstance we have here. I think it is a fallacy for Palfinger to argue that having lifeboats on the auger tension leg platform somehow do not facilitate the production of oil and gas. It cannot take place without those lifeboats being there, or fire suppression systems, or fast watercraft, or all the safety measures that are designed to protect the safety of platform workers engaged in oil and maritime law cannot apply. And Kirby is the foundation of Dwaron, and Dwaron ultimately asked that. And I believe Judge Summerhays took an extra step in his analysis and noted that the underpinnings of Kirby and Dwaron simply are not met. And Mr. McReynolds did not mention word one about what maritime commerce could possibly be implicated here. And in the absence of it, I just need to mention one final thing. In the highly unlikely event that maritime were to apply, this is not a circumstance, as Palfinger had argued in its pleadings, where the case can be rendered on appeal. It would have to be remanded back to the district court. Because what has not been presented here is the implications if maritime law does apply of its own force, how are the indemnities treated? Here, section 19.1 of the contract, which is in the record, the parties chose Texas law. Maritime law allows the parties to choose a law. Unlike Oxalib, which is a mandatory choice of law provision, maritime law allows the parties to select that law. Here it is Texas. Unlike in Crescent Energy, Judge Southwick, the parties chose maritime law, so they never had to take that additional step. But I mention that only not to dilute the absence of maritime commerce, not to imply that maritime law is applicable to this contract here. This is pure oil and gas exploration. Those lifeboats are necessary and mandatory for that production to take place. Oxalib has a mandatory choice of law provision, and here Louisiana law unquestionably disallows the enforcement of the indemnities. And absent any further questions, I am finished with my oral argument. We appreciate that. Thank you. Good morning, Your Honors. Raymond Lewis on behalf of the appellants. The first, I want to kind of go back, I think, to Judge Inglehart, your question about, well, what if this was looking at fire extinguishers, eyewash stations, hoses, what it may be. Well, those aren't traditional maritime items. Again, as Mr. Merrick Reynolds says, you find those in Texas and Oklahoma. Well, the thing you don't find are vessels. And the only vessels we have here are the lifeboats, which they have now, you know, happily admitted. Judge Southwick, I think you're correct. I think North Pacific and Cossack and Kirby and all the other cases that have cited the fact that a contract to repair a vessel, which we have now said this lifeboat is, are always going to be a maritime contract. I don't think we even need Dworon in this situation. Well, the problem is Dworon is there. Now, here's the footnote that's been mentioned a few times where Judge Davis sort of isolated perhaps the breadth of the opinion. But it seems to me a radical change in what the Fifth Circuit was trying to do in Dworon to say we leave that beside. And if we have to deal with Dworon in this case, it's very difficult for me yet to see how you succeed. But I think Mr. McReynolds and you are trying to substitute a different line of case law. No, I think, I think there's a recognition in all of the cases that there are multiple tests out there, even in this circuit, you have barriers, which actually modifies the first test under Dworon and changes it. It doesn't change it. Well, it extends it, but it takes it away from the E&P production context and says, you know, if you are, if you're simply services to facilitate activity on navigable waters, okay. So if, even if we have to move away from North Pacific, which I don't think we do, Dworon is, is inapplicable because factually it was so distinguishable from this case. In Dworon, the vessel was never even contemplated in the contract. It came apart, it came about because of, of exigent circumstances in the work where they realized what they needed to do, which would, had never been planned. They needed a crane for, and the platform couldn't sustain the crane. Now, in this case, we have a huge, a different fact pattern, because if you'll look and the record site is, is 2642, the only object, the only thing this contract was ever about is service on lifeboats or rescue craft. And the question before, I think, was asked about, well, what about repair? Well, B-2 is repair. And the only thing this touched was lifeboats. Let me say to opposing counsel's comment that these vessels were not in maritime commerce. There may be vessels. North Pacific was gearing up to go to Alaska. That sounds fairly commercial. I must say it's a lot to put on a 104-year-old case that considered all these things. So even going beyond North Pacific, how relevant is whether these lifeboats were in maritime commerce? So, and Judge, in expecting this argument, we, we address these in the reply. And the answer to that is, Shell is taking the very narrow view of maritime commerce that Justices Marshall and Scalia directly rejected in Foremost and Sison. Now, Foremost and Sison are tort cases, but they talk about maritime commerce, and they talk about what is needed in the context. And what they say is, is that we are not going to draw such this narrow version of maritime commerce, where you have to say that they're actually engaged in maritime commerce. It says, we're going to look at the potential effect that that activity or that incident may have on maritime commerce. And in here, just like in Foremost, where you had two pleasure crafts that, that actually, you know, collided, and they said that could block a maritime channel. And then, and then in Sison, you had a fire at a marina. And in both those cases, they have these hypotheticals. Well, here, if there's an issue on the auger, you're launching 10 vessels into the Gulf of Mexico. If you don't have this contract to repair them, you're going, you could create an additional emergency. You could create situations where these vessels, 10 new vessels in the Gulf, are now getting in the way of maritime commerce. It falls directly with what Foremost and Sison, I believe, were addressing, that you don't have to come in and cite specific examples of how these vessels are engaged in maritime commerce. And their only function, the only function they have, is to navigate the waters and save people from a, an emergency in open water. And again, I think, Your Honors, if, if, if we want to stick to this rigid construction of Duaron in, in exclusion of all the other tests that, that are out there, I think you could still say in this case that Duaron would find that this you look at the factors. If they want to say, and, and Judge Wilson, you mentioned it as well, that if the lifeboats are, are necessary for oil and gas on navigable waters, I think we think that's questionable. But if you want to say that, then the second test is met. Because the only thing that was ever contemplated by this contract, Record 2642, is work repair and, and dealings with a vessel. All right, Counsel. Thank you, Your Honors. Thanks to all three of you for your presentations this morning. We've had a short week of oral arguments. This was the last of the three days. We are adjourned.